(No. 4658–)

GEORGE A. PITTS, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed March 16, 1956.*

BERNARD T. GRIMES, Attorney for Claimant.

LATHAM CASTLE, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

FEARER, J.

Claimant, a farmer and cattle feeder in Towanda Township, McLean County, Illinois, has tracts of land along Illinois Route No. 9 and Illinois Route No. 165, which joins Route No. 9.

This action is brought for the loss of two steers on August 16, 1954, and two steers which died on August 17, 1954. It is contended that the cause of the death of the steers was due to the negligent spraying of weeds along the state right-of-way with a solution of 2, 4-D, and, also, that respondent's agents did not notify claimant, or the hired help in his absence, that they were going to spray the noxious weeds growing along the right-of-way adjoining the feeding lot and pasture where claimant's cattle were permitted to graze, and also near where certain steers were being held in a feed lot. The amount of the claim is in the sum of $993.00.

A brief statement of the facts is essential, for the reason that there was no direct testimony as to the cause of death of the steers in question. It is contended by claimant that he has proven his case by a preponderance or greater weight of the evidence, by circumstantial evidence, which can lead to but only one conclusion, and that is that the solution of 2, 4-D used by respondent's agents, when sprayed upon weeds, such as lambsquarter, and eaten by cattle produces and develops a high nitrate condition, and will cause their death. It is important to note at this time that no post-mortem was performed on the animals to determine the cause of their death.

It was stipulated by the parties, through their respective counsel, as follows:

"It is stipulated by the parties that claimant, George A. Pitts, is a resident of Towanda Township, McLean County, Illinois; that the farm land he farms

is in Sections 35, 36, Section 2 and Section 3, Old Town Township, McLean County, Illinois; that Illinois State Route No. 9 passes between the land in Old Town and Towanda Township, being Sections 35 and 36, Towanda Township; State Route No. 165 passes, and connects it on the south line between the two sections with Illinois State Route No. 9; that a fence of claimant passes along Route No. 9 for approximately one and a half miles; that the cattle of claimant were located in a feed lot at the northeast corner of the intersection of Routes Nos. 9 and 165, and immediately west of that intersection in another field on the north side of Route No. 9, that all reference to any spraying of weeds is on the north side of Route No. 9; that Route No. 9 is a State Bond Issue Road provided for in the Sixty Million Dollar Bond Issue Act.

It is further stipulated and agreed that the Report of the Division of Highways, dated February 21, 1955, signed by Earl McK. Guy, Engineer of Claims, and filed under Rule 16 of this Court, may be received in evidence as a part of the record in this case."

Claimant testified that there were 85 head of steers in the feeding lot at the northeast corner of the intersection of Routes Nos. 9 and 165, and on the west side there were 210 steers in the pasture, and that they were in those locations on August 9, 1954. On August 9, 1954, he was away on a cattle buying trip in Colorado, Wyoming, New Mexico and Texas, and did not return to his farm until about the 14th or 15th of that month. On the 16th day of August, two of the steers died, and the day following two more steers were found dead in the west pasture. He was not at home at the time the cattle were found dead, and the men working for him found the steers. His wife was at home at the time, and the men reported to her. The steers were pulled out of the feeding lot, and the rendering works was called to come and get them.

He further testified that he did not examine the cattle, and that the weeds were dying along the highway and the fence row of the pasture and feed lot. He called for a professional opinion as to what caused the death of the cattle, as he felt it was unusual to find perfectly healthy cattle dead in a feed lot. Mr. Cyril Burns, an em-

ployee of the State of Illinois, was called to determine what had been used to spray the weeds, as some of the tall weeds in the fence row had fallen over the fence, and the cattle had eaten them. This was on a weekend, and Mr. Burns asked if he had a mowing machine available to cut down and mow the rest of the weeds to prevent any more from falling into the fences. He and his men mowed the rest of the weeds along the fence line on Saturday afternoon, and he identified them as being lambsquarter, horseweeds and fox tail grass, which weeds varied in height from a foot to three feet, and stated they were growing very close to the fence. He did not see a steer reach through the fence and eat the weeds, but it was evident by looking at the weeds that they had wilted and fallen over the fence; that the stubs were there, and that some of the weeds had been eaten.

He also testified that he called Dr. Gaffin at Clinton, Mr. Gene Mossbacher of McLean County, Farm Adviser, and Dr. Marquardt, his veterinarian in Bloomington. He stated he had owned the cattle for sometime, and that they were in a healthy condition; furthermore, that no cattle died, other than the four testified to. He was unable to state as to what had been used to spray the weeds, but said that the solution used caused the weeds to die, wilt and drop down, and lean into the fences. He could tell that the weeds, which had been sprayed with the chemical, had been eaten.

There is no question but what the weeds had been sprayed with 2, 4-D, and that the spraying was done by Mr. Kellar, an employee of respondent.

There is further testimony by claimant that there were no weeds growing in the feed lot. He next described the lambsquarter, which he was able to identify, and

stated that it had not rained from August 9 until the date of the death of the cattle. He then testified as to the weight of the cattle, and the price per pound on the various steers as of the date of their deaths. There seems to be no question about the value of the cattle, and consequently the damages established.

On cross-examination, claimant testified that he had been absent from his home for about ten days to two weeks, and that he returned home a day or two after the cattle had died. The steers were approximately two years of age, and he had had them since November of 1953. They were purchased as feeders, being mixed between Herefords and Angus. He was not positive as to the breed of the cattle, which died, and he did not have a veterinarian out to look at the cattle. He stated the cattle had been on feed since December 1, 1953. He further testified that the cattle were on full feed, ground ration, consisting principally of corn, balanced with a protein supplement, and three pounds of hay a day. The Angus cattle referred to had been on the legume grass pasture on the north side of Route No. 9, west of the feed lot. Claimant stated he had owned 210 head of the cattle since September, 1953, and the balance since February, 1954, and they were all out on pasture. He testified that the weeds were all growing on the right-of-way, and that there were no weeds inside of the fences. The fences surrounding the feed lot were four feet high with two strands of barb wire on top, and it would have been possible for some of the weeds to have been eaten, but he could not find the stubs. The weeds along Route No. 9 were sprayed for approximately 50 yards.

Dr. Emmett H. Marquardt, a veterinarian of Bloomington, Illinois, testified that he had been the veterinarian

for claimant for many years; that, after being called by claimant, he went to his farm to examine the cattle, which were still living, and found the balance of the herd to be normal. He went to the right-of-way and examined the weeds, and determined that they had been sprayed with some material, because the tops had wilted, and the leaves were wilting, and some of the tall weeds had that characteristic crook where they started to die, and then grow again and come up, which was particularly true of the giant ragweed and the lambsquarter. Some of the weeds were hanging over the fence, and some drooped over the top of the fence. He stated he could determine that the lambsquarter had been eaten, being that portion which was through the fence, as the stump was still there; and, that the part of the weed toward the road was still intact. He went down and examined the terrain along the fences where the other cattle had been, and found lambsquarter and giant ragweed, and the condition of the weeds similar to that to which he had previously testified.

As to his personal experience concerning the effect of 2, 4-D on cattle, he stated his only information was through what he had read, and what he had learned at association meetings. From what he had been able to learn, the spraying of 2, 4-D on weeds, such as lambsquarter, creates a nitrate concentrate, which is very toxic, and this condition occurs within a week following a spraying. He further testified that he contacted Dean Graham of the University of Illinois, College of Veterinary Medicine, and that he received a letter from his Assistant, Mr. George T. Woods, which letter was marked exhibit A and was admitted in evidence. Professor Woods stated in the exhibit that 2, 4-D itself is not poisonous to cattle, but, when sprayed on certain plants, such as

lambsquarter, it causes a high concentration of nitrate to develop, and that, therefore, it is possible for animals to be poisoned in this manner, and such cases have been reported by veterinarians.

A hypothetical question was then propounded to Dr. Marquardt. He was asked an opinion as to the effect of the spraying of a 2, 4-D solution on weeds, such as lambsquarter, which were later eaten by cattle, and the cause of their subsequent death. This question was not objected to, and the witness stated that it was his opinion that the spraying was involved in the death of the cattle.

On cross-examination, these questions were propounded to him:

"Q. Do you know what caused the death of these four steers that he lost last summer?
A. No.
Q. Did you see the dead steers?
A. No.
Q. Now you gave an opinion based on your experience that cattle could die from eating various weeds that had been sprayed with 2, 4-D, did you not?
A. That is right.
Q. Do you have any opinion as to how much of such weeds the cattle would need to eat in order to cause death?
A. No, I wouldn't know.
Q. Did you ever see any cattle that had died from eating weeds that had been sprayed by 2, 4-D?
A. I had seen cattle that died of nitrate poisoning.
Q. Have you ever seen any that died from eating weeds that you knew had been sprayed with 2, 4-D?
A. Yes.
Q. Will you tell us where they were, and what they looked like?
A. Well they died suddenly."

He was unable to testify from an outward examination whether the cause of death was from eating weeds sprayed with 2, 4-D, or some other cause. He was further cross-examined as to various articles and tests made by the U.S. Department of Agriculture as to the effect of

2, 4-D fed to cattle in grain. He said that he was familiar with some of the tests, and that he recognized that 2, 4-D was checked for its effect upon warm blooded animals before it was put on the market. His answer was that he understood it was nontoxic. He was unable to testify as to the spray that was used on the weeds adjoining claimant's farm. The examination of the rest of the cattle on the farm was merely by observation. He concluded by testifying that cattle can get nitrates from other plants, particularly from Urea, a nitrate nitrogen compound, which is mixed with feed to fatten cattle. He did not have any knowledge as to whether or not claimant was feeding Urea, and stated that cattle sometimes die from an improper mixture of feed.

James Miller, an employee of claimant, testified that he was on the farm on August 16 and August 17; that he personally fed the cattle ground feed and supplement, and that this was also true as to the large ones in the dry feed lot. He was asked if he knew what Urea was, and he said he did not, but that he was feeding the cattle linseed pellets, molasses, ground corn and hay. To his knowledge there was no Urea in any of the feed, and the cattle in the west pasture were on grass, and were not fed a supplement or feed of any kind, except regular cattle salt. Respondent's agents did not tell him they were going to spray the weeds, and he did not know when they did it. After the steers died, he checked the weeds around the feed lot, and the feed given to the cattle, but could not determine the cause of their deaths. He substantiated claimant's testimony as to the weeds growing around the fence, and his observation as to their condition after they were sprayed.

On cross-examination he testified that the only other cattle, which had died in the field, did so in the late fall after a light frost, and these steers died from bloat. He was unable to identify any particular weed as being more prominent than others, and stated the weeds he referred to were a mixture, such as grow along the right-of-way lines, which have heretofore been referred to. He identified the lambsquarter as being a large weed with a few leaves, which would grow about 2½ feet tall.

The next witness for claimant was Mr. Elliott Aussieker, who was working on the farm at the time the steers died. As to this witness, his testimony substantiated that of other witnesses for claimant. However, when asked whether or not he could tell if the cattle died from natural causes or not, his answer was "no".

Mr. Edward M. Willens, testifying for respondent, stated that he was employed by the State of Illinois as a District Landscape Architect in District No. 3, Ottawa, Illinois, and that his territory covered LaSalle, Livingston, McLean, Grundy, Kankakee, Iroquois, Ford, part of Kendall, part of Putnam, and part of Champaign Counties; and, that claimant's farm was in his territory. He testified he had been employed by the State of Illinois for more than 20 years, and that Mr. John Grayhack, Jr., was District Engineer of District No. 3. Witness was shown respondent's exhibit No. 1, which was a letter written by the College of Agriculture, University of Illinois, by Prof. F. W. Slife, Asst. Professor of Agronomy. It was stipulated by the attorneys for claimant and respondent that this letter be admitted in evidence, the contents of which in substance are as follows: "There are several articles in the literature on the effects of 2, 4-D on warm blooded animals indicating that it is relatively nontoxic, and that

large doses can be consumed without any material effect. There is no reason to believe that a 2, 4-D material put out by different companies would change this outlook. The basis of 2, 4-D material is the same, but the carrier varies slightly with the different companies. Since these carriers are reasonably nontoxic, then there is no basis for us to believe that any of them would be harmful.''

The witness further testified that respondent used spraying operations to control weeds and vegetation growing along the right-of-way, and that he had full charge of this within his district. He stated there were approximately three landscape crews, and that a daily record and report were submitted by each crew; and that Mr. Randolph M. Kellar, a maintenance worker under his jurisdiction at Odell, Illinois, was an operator of the spraying equipment. He further stated respondent had been carrying on the spraying operation of weeds for approximately six years, and that for the last four years had been spraying complete right-of-ways from the edge of the slab of the concrete to the right-of-way line with state owned equipment. For the past year this had been done with John Beam machines, which have a 300 gallon capacity, and test out at approximately 17 acres to a tank, the formula being 1 quart of 2, 4-D per acre; hence to each 300 gallons was added 4 gallons or 16 quarts of material. The nozzles of the machine were tested so that they would spray approximately one quart of the solution per acre, which is required to get a good kill. In 1954 this material and mixture was used in his District, being 4 gallons of 2, 4-D to 300 gallons of water, and this was the mixture and material used in the spraying operations along the right-of-way on Route No. 9 by claimant's farm. The first two years 2, 4-D was used, a solution of 9 tea-

spoons of 2, 4-D to 3 gallons of water was applied with hand sprays. The next two years 2 Friend sprayers of 200 gallon capacity and about the same ratio of 2, 4-D and water were used.

The next witness called for respondent was Mr. Randolph M. Kellar, an employee of the State of Illinois, who was directly under the supervision of Mr. Ed Willens. He testified that he had worked for the State of Illinois for a little over two years; that he was acquainted with the right-of-way along Route No. 9 in McLean County, but could not say exactly where claimant's farm was located. He testified as to the type of spraying equipment and mixture used along Route No. 9 in 1954, and stated he had used this mixture for one year, but that no one was notified when spraying operations were to take place along Route No. 9. He testified that no complaints were ever made about the spraying along the right-of-way having any ill effects on animals.

Mr. Cyril V. Burns, a Maintenance Field Engineer for District No. 3, and a graduate of Washington State College, testified that he was called by claimant to come to his farm after the steers had died on about August 21, 1954. In examining the right-of-way line, he particularly noticed plain ragweeds and giant ragweeds, or horseweeds. He stated that the chemical used was manufactured by the Riverdale Chemical Corporation, and that this same material was used in spraying over 600 miles of right-of-way. He further testified that the Riverdale 2, 4-D, which was being used, was not of different strengths, and that he had read that the material was nontoxic, but was not testifying as an expert.

We are familiar with the rule as to circumstantial evidence that it is proof of certain facts and circum-

stances in a given case from which the jury may infer from connected facts, which usually and reasonably follow according to the common experience of mankind.

We are also cognizant of the fact that this Court, in the absence of a jury, is the tryer of the facts, and has a right to consider circumstantial evidence.

We are also familiar with the law in regard to speculative evidence in negligence cases, i. e., liability cannot rest upon imagination, speculation or conjecture, nor upon a choice between two views equally compatible with the evidence, but it must be based upon facts established by evidence fairly tending to prove them. Claimant has the burden of proof to establish his claim by a preponderance or greater weight of the evidence as to: (1) Freedom from contributory negligence, (2) Negligence of respondent, and (3) Question of damages. He has the burden of proving all three propositions before he can recover. The negligence of respondent relied upon is the failure of respondent's agents to notify claimant that spraying operations were taking place along the right-of-way outside of the pasture and feed lot where the cattle were being held, and the question of negligence in using the solution of 2, 4-D with a mixture of water as producing a toxic condition in warm blooded animals.

We are of the opinion that claimant has failed to prove his claim by a preponderance or greater weight of the evidence, either by direct or circumstantial evidence, by which we could reach the conclusion that the steers did not die from some cause other than the spraying of the weeds referred to along the right-of-way. The evidence claimant is relying upon is too speculative, and leaves too much to conjecture. As to the giving of notice, this, of course, would be very impractical. If respondent

was required to give notice to all land owners or farmers that certain spraying operations were going to take place at a certain time, this would probably leave very little time within which to actually spray along the right-of-way.

There is professional testimony that 2, 4-D mixed with water in the ratio of four gallons of 2, 4-D ester to 300 gallons of water had been used in 1954 to spray approximately 600 miles of right-of-way. We can't help but be impressed with the fact that respondent has experienced no other complaints by reason of such spraying operations with the solution. However, we are also aware that this testimony would be incompetent had an objection been made, and we feel sure that the Commissioner would have sustained the same, as the testimony would have to relate to the spraying of the weeds in question, which claimant's witnesses believed were eaten by the steers, which died. We do know that professional expert testimony could have been offered, which would have given this Court some direct testimony as to the cause of death, had a post-mortem been performed, which we believe would have been the proper thing to do, and then the veterinarian, after making the post-mortem, could have testified as to his opinion of the cause of death.

There are a great many thousands of miles of state right-of-ways upon which spraying operations are carried on by respondent in the State of Illinois, and, in view of the testimony of respondent's agents as to the material used and the supervision for applying the solution, it is hard for us to believe that respondent would be guilty of using a solution, which would be injurious to warm blooded animals, with knowledge that a great many miles of right-of-way would be adjacent to feeding lots and

pastures where animals are enclosed, and further realizing that animals are inclined to lean over the fence, and eat weeds and vegetation, particularly when pastures might be short.

If we were to allow a claim of this kind, based upon the type of proof offered, and without the advantage of professional testimony in regard to a post-mortem, we can conceive where the state would be subjected to innumerable claims running into many hundreds of thousands of dollars without having the protection, which we believe the state is entitled to, and which we believe to be necessary before claims of this type can be allowed by this Court.

The claim of George A. Pitts is, therefore, denied.